UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

CHARLES PAYTON,

        Plaintiff,

v.

UNKNOWN GOLLADAY et al.,

        Defendants.

_____/

Case No. 2:19-cv-10

Honorable Gordon J. Quist

## **OPINION**

      This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez,* 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Quinn, Stabile, LaPonsie, Nichols, Fountain, Mahar, Hall, and Munro under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will also dismiss, for failure to state a claim, Plaintiff's claims that Defendants Golladay and Bender denied him immediate access to the restroom.

## Discussion

I.  Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues Corrections Officers Unknown Golladay, Unknown Bender, Unknown Pancheri, Unknown Bergeron, Unknown Quinn, Unknown Stabile, Unknown LaPonsie, Unknown Nichols, Unknown Fountain, Unknown Pawley, Unknown Wilcox, Unknown Mahar, Unknown Russo, Unknown Schimmelpenny, and Unknown Segmann. Plaintiff also names Sergeant Unknown Blemke and Corrections Officers Unknown Sprague, Unknown Stevenson, Unknown Hall, Unknown Munro, Unknown Koben, Unknown Portice, Unknown Portafield, Unknown Bosbous, Unknown Benoit, and Unknown Caldwell.

Plaintiff alleges that on November 25, 2015, at 6:30 a.m., he asked Defendant Golladay if he could use the restroom. Plaintiff was on top lock sanctions at the time. Defendant Golladay refused to allow Plaintiff to use the restroom. At 7:00 a.m., Plaintiff asked one of Defendant Golladay's co-workers if he could use the restroom, but his request was denied. At 7:45 a.m., Plaintiff urinated on himself because he could no longer hold his bladder. Plaintiff filed a grievance regarding the matter.

On December 17, 2015, Defendant Golladay stopped Plaintiff and ordered him to pull his shirt up. Plaintiff removed a bag of chips from his pocket, thinking that was the source of Defendant Golladay's concern. Plaintiff stated that he planned on eating them in the dayroom. Defendant Golladay again ordered Plaintiff to pull his shirt up. Defendant Gollady then said, "Oh um. What's wrong with your pants?" Plaintiff stated that his pants were pulled up to his waist. Defendant Golladay said, "It's not that. But it's bulging from behind and you're a&$ is hanging

out through the pants." Plaintiff was offended and told Defendant Golladay that he did not "swing that way" and did not appreciate Defendant Golladay's comments. Defendant Golladay looked at Plaintiff's I.D. card and replied that Plaintiff was the one who had filed a grievance on him. Defendant Golladay added that Plaintiff should get used to tickets. Plaintiff filed a grievance on Defendant Golladay.

On January 2, 2016, at 4:51 p.m., Plaintiff asked Defendant Bender if he could use the restroom. Defendant Bender told Plaintiff to wait until the "top of the hour." Plaintiff finally received permission to use the restroom at 5:40 p.m., after having to hold his bladder for thirty-nine minutes. Plaintiff filed a grievance on Defendant Bender.

On January 14, 2016, at 2:35 a.m., Plaintiff asked Defendant Pancheri to sign and process his phone disbursement. Defendant Pancheri replied, "I'll sign it only if you sign off and stop filing grievances on my officers here." Plaintiff filed a grievance on Defendant Pancheri.

On January 26, 2016, Defendant Bender stopped Plaintiff and stated, "I hear you like to sit at the table with Parker (inmate #593090) and write grievances on me and my co-workers. Let's see if you can take the treatment [Sergeant] Pewley is going to give Parker (inmate #593090). Yeah, let's see if you like being in your cell for the rest of your stay here." Plaintiff filed a grievance on Defendant Bender.

On January 28, 2016, Plaintiff was called to the officer's desk. Defendant Bender told Plaintiff that he had been written a misconduct ticket the previous day. Plaintiff protested that he had done nothing wrong. Defendant Bender told Plaintiff that he was making good on his promise and that he was "the rule." Defendant Bender also stated that he hoped Plaintiff liked to have his cell "tore up." Plaintiff filed another grievance on Defendant Bender.

On February 2, 2016, at 11:40 a.m., Defendant Stabile walked passed Plaintiff's cell approximately eight times during a two minute period, making eye contact with Plaintiff each time. At 11:45 a.m., Defendant Stabile stopped Plaintiff as he was entering the restroom and asked for his I.D. card. Plaintiff complied. Defendant Stabile stated, "You['re] the one Golladay told me about. You like to write grievances? Let's see if we can put a[n] end to that by the time I leave." At 2:50 p.m., Defendant Stabile entered Plaintiff's cell and ransacked it, leaving Plaintiff's property scattered all over the floor. When Plaintiff asked why he had done it, Defendant Stabile said, "That's what happens when you challenge the authority around here. Maybe you'll get the message for those that oppose us. Now clean up, before it miraculously gets worse." Plaintiff filed a grievance on Defendant Stabile.

On February 2, 2016, at 7:00 a.m., Plaintiff asked Defendant Golladay if he could use the restroom. Defendant Golladay refused. Plaintiff explained that he desperately needed to urinate and Defendant Golladay told him to "deal with it." Plaintiff was not allowed to use the restroom until 7:30 a.m. Plaintiff filed a grievance on Defendant Golladay.

On February 6, 2016, at 7:27 a.m., Plaintiff asked Defendant LaPonsie if he could use the restroom. Defendant LaPonsie told Plaintiff to wait until the top of the hour, but Plaintiff protested that he really had to go. Defendant LaPonsie again refused. Plaintiff was forced to wait until 8:01 a.m. to use the restroom. At 10:00 a.m. on the same date, Plaintiff asked Defendant Nichols if he could use the restroom. Defendant Nichols told Plaintiff to wait until the top of the hour. Plaintiff stated that he had not been out of his cell that day and needed to use the restroom. Plaintiff then asked Defendant Fountain to use the restroom and was again told to wait until the top of the hour. Plaintiff told Defendant Fountain that Defendant Nichols had told him to wait until the next hour. Defendant Fountain continued to refuse Plaintiff's request. Plaintiff was

4

forced to urinate in the garbage can in his cell, which caused tension and a threat of violence between Plaintiff and his cellmate. Plaintiff filed a grievance regarding the incident.

On February 16, 2016, at 10:36 a.m., Plaintiff gave Defendant Pancheri a disbursement authorization form and two copies of Plaintiff's petition for writ of habeas corpus, to be mailed to the United States Court of Appeals. On June 3, 2016, Plaintiff wrote to the court asking about the status of his habeas corpus petition. On June 16, 2016, the court notified Plaintiff that it had never received his petition. Plaintiff filed a grievance on Defendant Pancheri and URF Mailroom personnel, asserting retaliation and denial of access to the courts.

On February 21, 2016, Defendants Wilcox and Pawley searched Plaintiff and took his store items. Defendant Pawley also took legal papers and notes from a P.R.E.A complaint that Plaintiff had written on Defendant Golladay. Defendant Pawley told Plaintiff that he would see about putting an end to his legal filings. Plaintiff asked Defendant Pawley to return his legal papers, but Defendant Pawley refused.

Defendant Pawley subsequently showed Defendant Golladay the complaint that Plaintiff had written on him while Plaintiff watched from the dayroom. Defendant Pawley then gave Plaintiff his complaint back and Defendant Golladay stated that he was tired of "this f#$king coon." Defendant Pawley stated that Defendant Golladay knew what to do. Defendant Wilcox then entered the unit and gave Plaintiff a contraband report and a misconduct ticket. Defendant Golladay told Plaintiff to come to the officer desk for a ticket review, but Plaintiff replied that he was waiving his right to a review. Defendants Golladay and Pawley "pulled their security pins," calling for other officers and locking down the unit. Plaintiff and other prisoners were locked inside the dayroom. Plaintiff was taken to the segregation unit and strip searched. Defendant Pawley then retook Plaintiff's legal papers and never returned them. Plaintiff received a

5

misconduct ticket for refusing to come to the officers' desk for a ticket review. Plaintiff filed a grievance about the matter.

After Plaintiff was released from segregation, he discovered that staff had broken his $88.97 keyboard and his $11.50 LED book light, and had stolen his MP3 player adaptor and ear buds, which cost $15.90 each. Plaintiff filed a claim with the Administrative Board for the loss, but his claim was denied.

On May 28, 2016, at 3:00 p.m., Defendant Russo walked into the dayroom and asked for Plaintiff's I.D. card. Plaintiff complied and Defendant Russo took Plaintiff's I.D., refusing to return it. Because Plaintiff did not have his I.D. card, he was unable to go to the food service building to eat, nor could he go to yard. Defendant Russo finally returned Plaintiff's I.D. card at 9:00 p.m. by sliding it under Plaintiff's door during count. Plaintiff filed a grievance on Defendant Russo. Defendant Russo wrote a false misconduct on Plaintiff, asserting that he asked to see Plaintiff's I.D. card at 6:45 p.m., but that Plaintiff did not have his I.D. card when asked.

On June 10, 2016, Plaintiff told Defendant Bergeron that he wished to waive the review process for a misconduct ticket. Defendant Bergeron threatened Plaintiff with harsher punishment for waiving the review. Defendant Quinn stated that Plaintiff thought he was too good for them and liked writing the warden to complain about staff. Defendant Bergeron stated, "We'll just have to cut off his communication." Defendant Quinn then stated, "All he need[s] is for his T.V. and sh%t broke up and confiscated, and a knife to magically be found in his possession." Plaintiff asked for a grievance form. Defendant Quinn told Plaintiff to make sure that he spelled his name right because Defendants would be going at him from now on. Defendant Bergeron then confiscated nine of Plaintiff's metered envelopes and some completed grievances. Plaintiff asked for another grievance form and Defendant Quinn asked Plaintiff how he planned to mail it out with

6

no envelopes. On June 20, 2016, Plaintiff filed a grievance on Defendant Russo for falsifying a misconduct report.

On May 30, 2017, at 6:45 p.m., Defendant Schimmelpenny performed a shakedown on Plaintiff. Defendant Schimmelpenny recognized Plaintiff, noting that Plaintiff was a troublemaker who liked to file grievances. Defendant Schimmelpenny placed Plaintiff in handcuffs and called other officers. Plaintiff was taken to segregation and received a false misconduct ticket for refusing to allow a clothed body search. Plaintiff filed a grievance. On June 5, 2017, during the misconduct review, Plaintiff requested a review of the camera footage, which showed that Plaintiff had allowed himself to be searched.

On September 1, 2017, Defendant Segmann stopped Plaintiff and took his personal journal, which consisted of Plaintiff's African cultural, social, political, historical, religious, and legal views, as well as his unfinished legal work. Defendant Segmann then spent 15 to 20 minutes reading Plaintiff's journal. Defendant Segmann noted that Plaintiff liked to write grievances and stated that he was going to have Plaintiff placed on STG [Security Threat Group] status. Plaintiff asked what about his journal would be considered STG material and Defendant Segmann stated "Whatever I say it is." Defendant Segmann admittedly took seventeen pages of Plaintiff's writings.

On October 23, 2018, Plaintiff was walking from his health care appointment to his law library assignment, when Defendant Hall stopped him and told him he was late. Plaintiff explained that his unit officer had just checked with health care and signed his pass for library. Defendant Hall said he thought Plaintiff was lying and Plaintiff told Defendant Hall to check his pass. Defendant Hall ordered another officer to search Plaintiff while he searched Plaintiff's legal

7

materials. Defendant Hall then ordered Plaintiff to return to his cell, stating that he was going to teach Plaintiff a lesson for filing complaints on staff. Plaintiff filed a grievance.

On November 14, 2018, at 12:05 a.m., Defendant Sprague came to Plaintiff's cell and said, "You thought that writing [Sergeant] Blemke up in a P.R.E.A. complaint is okay? Open the f$king door, give me your I.D. I'm writing you a ticket." Defendant Sprague took Plaintiff's I.D. and never returned it. At 2:04 a.m., Plaintiff asked Defendant Sprague her name and she told him to go ahead and write her up, because she was going to make his life a living hell. A short time later, Defendant Bernard came to Plaintiff's cell and returned his I.D. Defendant Bernard asked Plaintiff if he had a problem with one of Defendant Bernard's officers. Plaintiff did not answer. Plaintiff later received a false misconduct report which had been written by Defendant Sprague for loitering.

On November 20, 2018, at 11:09 a.m., Plaintiff noticed that the food service worker did not give him a bun with his meal. Plaintiff attempted to return to the line for the missing item, but Defendant Bender refused to allow him to get back in line and took his I.D. card. Defendant Bender asked Plaintiff if he was still writing grievances, and stated that he was going to get Plaintiff. Defendant Bender then ordered Plaintiff to leave food services, telling Plaintiff that he was going to send someone to shake down his cell and that they would probably find a shank.

On November 22, 2018, at 1:20 p.m., Plaintiff asked Defendant Stevenson for a pass so he could go to food services to eat. Defendant Stevenson refused. Plaintiff filed a grievance. On November 23, 2018, at 12:10 a.m., Defendant Bernard denied Plaintiff's request to go to the restroom. Defendant Bernard told Plaintiff to wait until after count. Plaintiff was not allowed to go to the restroom until 1:15 a.m. Plaintiff filed a grievance.

8

On November 29, 2018, at 10:33 a.m., Defendant Golladay ordered Plaintiff to the Resident Unit Manager's office as he was returning from the law library with legal materials. Plaintiff stated that he would go to the Resident Unit Manager's office as soon as he placed his legal materials in his cell. Defendant Golladay ran after Plaintiff shouting, "Get your f#$king a%$ down stairs now before I taser you're [sic] a%$ Nigger, and have you placed in the hold." Plaintiff complied with Defendant Golladay's order. During the ticket review, Plaintiff reported Defendant Golladay's unprofessional conduct and use of a racial slur to Resident Unit Manager Lacross, but Defendant Lacross acted as if Defendant Golladay had done nothing wrong. Plaintiff filed a grievance. Defendant Golladay wrote a misconduct on Plaintiff, in which he admitted following Plaintiff and yelling at him.

On November 30, 2018, Defendant Golladay threatened Plaintiff, stating that it was going to get worse for him. Plaintiff filed a grievance. On December 1, 2018, Plaintiff, who was on top lock sanctions, asked for a pass to food service. Defendant Munro refused, so Plaintiff was unable to go eat. On December 2, 2018, Defendants Golladay, Koben, and Portice refused to write Plaintiff passes to food service for breakfast, lunch, and dinner, thus denying him the ability to eat.

On December 3, 2018, Defendant Blemke watched as Defendant Golladay refused to give Plaintiff a pass for food service at 7:17 a.m. Defendant Golladay stated that Plaintiff had messed with both him and Defendant Blemke, and that they would find out how long it took for Plaintiff to pass out. Defendant Blemke stated, "I was starting to think that you guys were getting soft on me, and wasn't gone [sic] get him. I told [Sergeant] Belonged to write him up for the P.R.E.A., you see what happened with that. Thanks finally, I see the results. I'll continue to check on this project." Plaintiff filed a grievance. At 12:19 p.m., Plaintiff asked for a pass to food service, but Defendant Blemke told Plaintiff to go back to his cell. Plaintiff wrote another

grievance. At 5:25 p.m., Defendant Portafield denied Plaintiff a pass to go to food service. Plaintiff wrote another grievance.

On December 4, 2018, at 12:26 p.m., Defendant Pancheri denied Plaintiff a pass to food service. On December 7, 2018, Defendants Golladay, Bosbous, and Benoit denied him passes to food service during each meal. On December 8, 2018, Defendants Golladay and Caldwell denied Plaintiff a pass for the midday meal. On December 9, 2018, Defendants Stevenson and Golladay denied Plaintiff a pass for the midday meal, and Defendant Portice denied him a pass for the evening meal.

On December 10, 2018, Defendant Golladay denied him a pass for the noon meal. On December 11, 2018, Defendants Golladay and Portafield denied him meal passes for the midday and evening meals. Plaintiff states that as a result of being denied meals for ten days, he suffered from weight loss, dizziness, hunger pains, depression, and stress. Plaintiff also states he suffers from leakage before and after urination as a result of being denied access to the bathroom. On December 22, 2018, Plaintiff filed a grievance on URF Grievance Coordinator M. McLean for failing to process Plaintiff's grievances.

Plaintiff claims that Defendants' conduct violated his rights under the First and Eighth Amendments. Plaintiff seeks compensatory and punitive damages, as well as equitable relief.

II. Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include

more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Initially the Court notes that it is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 544 (holding that, in order

11

to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). The Sixth Circuit "has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (citing *Terrance v. Northville Reg'l Psych. Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002)). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints. *See Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing the plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant)); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries."); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Krych v. Hvass*, 83 F. App'x 854, 855 (8th Cir. 2003); *Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1974); *Williams v. Hopkins*, No. 06-14064, 2007 WL 2572406, at *4 (E.D. Mich. Sept. 6, 2007); *McCoy v. McBride*, No. 3:96-cv-227RP, 1996 WL 697937, at *2 (N.D. Ind. Nov. 5, 1996); *Eckford-El v. Toombs*, 760 F. Supp. 1267, 1272-73 (W.D. Mich. 1991). Plaintiff fails to even mention Defendants Mahar and Munro in the body of his complaint. His allegations against them fall far short of the minimal pleading standards under Fed. R. Civ. P. 8 (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). Therefore, Defendants Mahar and Munro are properly dismissed.

Plaintiff asserts retaliation claims against many of the named Defendants in this case. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff claims that Defendant Quinn retaliated against him by making harassing comments about how all Plaintiff needed was to have his television broken and confiscated or for contraband to be found in his cell. When Plaintiff asked for a grievance form, Defendant Quinn told Plaintiff to make sure that he spelled his name right because Defendants would be going at him from now on. After Defendant Bergeron confiscated Plaintiff's metered envelopes and some completed grievances, Defendant Quinn asked Plaintiff how he planned to mail his grievances out with no envelopes. In *Thaddeus-X*, the Sixth Circuit recognized that some threats and deprivations are too minimal to constitute adverse action. Citing *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982), the *Thaddeus-X* court held that minor harassment is insufficient to constitute adverse action, because recognition of such a standard would "'trivialize the First Amendment.'" *Thaddeus-X* 175 F.3d at 398-99 (citing *Bart*, 677 F.2d at 625). Because Plaintiff fails to allege anything more than verbal harassment by Defendant Quinn, Defendant Quinn is properly dismissed from this action.

Plaintiff claims that Defendant Stabile retaliated against him on February 2, 2016, when he stopped Plaintiff as he was entering the restroom and asked for his I.D. card. Plaintiff complied. Defendant Stabile stated, "You['re] the one Golladay told me about. You like to write grievances? Let's see if we can put a[n] end to that by the time I leave." At 2:50 p.m., Defendant Stabile entered Plaintiff's cell and ransacked it, leaving Plaintiff's property scattered all over the floor. When Plaintiff asked why he had done it, Defendant Stabile said, "That's what happens when you challenge the authority around here. Maybe you'll get the message for those that oppose us. Now clean up, before it miraculously gets worse."

In addressing a similar claim, the Sixth Circuit noted:

> We have held that "[a] single shakedown, unaccompanied by excessive use of force, verbal threats, a pattern of previous questionable shakedowns or other such factors, would not meet the adverse action standard." *Reynolds-Bey v. Harris*, 428 F. App'x 493, 503-04 (6th Cir. 2011); *see also Tate v. Campbell*, 85 F. App'x 413, 417 (6th Cir. 2003) ("[T]he single search of a prison cubicle would not deter a person of 'ordinary firmness' from pursuing constitutional grievances."). But we have also held that a prisoner suffered an adverse action when corrections officers twice left his cell in disarray after a shakedown, confiscated his legal papers, and stole his medically-necessary diet snacks. *See Bell v. Johnson*, 308 F.3d 594, 605 (6th Cir. 2002).

*Moore v. Hamel*, No. 18-1279, 2019 WL 1224657, at *3 (6th Cir. Jan. 28, 2019). Plaintiff claims that Defendant Stabile searched his cell and left property scattered on the floor on one occasion. Such conduct is not sufficiently adverse to deter a person of ordinary firmness from pursuing constitutional grievances. Therefore, Defendant Stabile is properly dismissed from this action.

Plaintiff claims that Defendant Hall retaliated against him on October 23, 2018, when Defendant Hall refused to allow Plaintiff to go to the law library, called him a liar, and searched Plaintiff's legal materials. Plaintiff fails to state a retaliation claim because Defendant Hall took no adverse action against Plaintiff "that would deter a person of ordinary firmness from continuing to engage in that conduct." *Thaddeus-X*, 175 F.3d at 394. Because Plaintiff does not

14

assert any other claims against Defendant Hall, Defendant Hall is properly dismissed from this action.

Plaintiff claims that many of the named Defendants violated his rights under the Eighth Amendment when they made him wait between 30 minutes to 1 hour to use the restroom. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

Allegations about temporary inconveniences, e.g., being deprived of a lower bunk, subjected to a flooded cell, or deprived of a working toilet, do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *see also J.P. v. Taft*, 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006) ("[M]inor inconveniences resulting from the difficulties in administering a large detention facility do not give rise to a constitutional claim." (internal citation omitted)).

The Sixth Circuit has held that it does not violate the Eighth Amendment to require prisoners to use nonflushable toilets on occasion. *Knop v. Johnson*, 977 F.2d 996, 1013 (6th Cir. 1992). Moreover, in *Hartsfield v. Vidor*, 199 F.3d 305 (6th Cir. 1999), the Sixth Circuit held that the Eighth Amendment was not violated where prison officials denied the plaintiff use of the toilet and fresh drinking water and allowed him to sit in his own urine for an 8-hour period on two separate occasions. *Id.* at 309-10. In so doing, the Court noted that it had previously held that deprivations of fresh water and access to the toilet for a 20-hour period, while harsh, were not cruel and unusual punishment. *Id.* at 310 (citing *Stephens v. Carter Cty Jail*, 816 F.2d 682 (6th Cir. 1987)).

> "[T]he Eighth Amendment does not require that prisoners enjoy immediately available and flushable toilets." *Abdur-Reheem-X v. McGinnis,* No. 99-1075, 198 F.3d 244, 1999 WL 1045069 (6th Cir. Nov.12, 1999) (p.c.) Keith, Norris, Clay) (citing *Knop v. Johnson,* 977 F.2d 996, 1013 (6th Cir. 1992)). *See, e.g.,* holding that inmate failed to state an Eighth Amendment claim related to toilet access: *Dells v. Corrections Corp. of America,* 257 F.3d 508, 511-12 (6th Cir. 2001) (prison deprived inmate of a lower bunk, subjected him to a flooded cell, and deprived him of a working toilet for an unspecified period of time); *Tate v. Campbell,* 85 F. App'x 413, 417 (6th Cir. 2003) (Batchelder, Rogers, *D.J. Russell* ) (preventing access to toilet for three hours, causing prisoner to experience an uncomfortably full bladder but not soil himself); *AbdurReheem-X,* 1999 WL 1045069 (prison assigned inmate a cell without a toilet, requiring him to wait until guard made the rounds every half-hour and ask permission to be escorted to a toilet, but the evidence showed that he was given the opportunity to go to a toilet when he asked); *Rivers v. Pitcher,* No.

16

95-1167, 68 F.3d 475, 1995 WL 603313 (6th Cir. Oct.11, 1995) (Kennedy, Moore, D.J. Johnstone) (inmate was allowed to use the toilet every two hours); *Williams v. Bond,* 2007 WL 1712613, *2 (W.D. Mich. June 12, 2008) (Bell, C.J.) (denial of one-time request to leave the day room to use the toilet) (footnotes omitted)[.]

*Walters v. Curtin*, No. 1:08-cv-688, 2008 WL 4756022, at *1 (W.D. Mich. Oct. 23, 2008).

Plaintiff claims that Defendant LaPonsie violated his Eighth Amendment rights on February 6, 2016, when Plaintiff asked Defendant LaPonsie if he could use the restroom, and at 7:27 a.m. Defendant LaPonsie told Plaintiff to wait until the top of the hour. Plaintiff protested that he really had to go. Defendant LaPonsie again refused. Plaintiff was forced to wait until 8:01 a.m. to use the restroom. The Court concludes that Defendant LaPonsie's conduct in forcing Plaintiff to wait 34 minutes to use the restroom did not rise to the level of an Eighth Amendment violation. Therefore, Defendant LaPonsie is properly dismissed from this action.

Plaintiff claims that Defendants Nichols and Fountain violated his Eighth Amendment rights at 10:00 a.m. on February 6, 2016, when each of them told Plaintiff to wait until the top of the hour to use the restroom. Plaintiff states that he was unable to hold his urine and was forced to urinate in the garbage can in his cell, which caused tension and a threat of violence between Plaintiff and his cellmate. As noted above, the requirement that Plaintiff wait for an hour to use the toilet does not rise to the level of deliberate indifference. Because there are no other claims against Defendants Nichols and Fountain, they are properly dismissed from this action.

Plaintiff also asserts claims against Defendants Bender and Golladay for refusing him access to the restroom upon Plaintiff's request. Plaintiff claims that on January 2, 2016, at 4:51 p.m., he asked Defendant Bender if he could use the restroom and Defendant Bender told him to wait until the "top of the hour." Plaintiff finally received permission to use the restroom at 5:40 p.m., after having to hold his bladder for 39 minutes. Plaintiff contends that on November 25,

17

2015, Defendant Golladay denied his request to go to the restroom at 6:30 a.m. and that another prison employee refused to allow Plaintiff to go to the restroom at 7:00 a.m. At 7:45 a.m., Plaintiff could no longer wait and urinated on himself. Plaintiff also alleges that on February 2, 2016, Defendant Golladay forced him to wait for 30 minutes before allowing him to go to the restroom. As noted above, such conduct does not violate the Eighth Amendment. Therefore, Plaintiff's claims regarding the alleged denial of his requests to use the toilet by Defendants Bender and Golladay are properly dismissed.

The Court notes that Plaintiff's First and Eighth Amendment claims against Defendants Golladay, Bender, Pancheri, Russo, Blemke, Stevenson, Koben, Portice, Portafield, Bosbous, Benoit, and Caldwell for denying Plaintiff approximately 17 meals on the following dates: November 22, 2018, December 1-4, 2018, and December 7-9, 2018, are not clearly frivolous and may not be dismissed on initial review. Particularly since Plaintiff was deprived of all meals for a period of three and a half days from December 1, 2018, until the midday meal on December 4, 2018. Such conduct is clearly adverse for purposes of a retaliation claim and constitutes deliberate indifference.

In addition, Plaintiff's claims against Defendants Bergeron, Pawley, Wilcox, and Segmann for the retaliatory searches and confiscation of legal papers, legal mail supplies, and other property is sufficiently adverse to satisfy the adverse-action requirement of *Thaddeus-X*. *See Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (citing *Walker v. Bain*, 257 F.3d 660, 664 (6th Cir. 2001)). Nor are Plaintiff's claims against Defendants Schimmelpenny and Sprague for writing false retaliatory misconduct tickets on him clearly without merit. Thus, these claims may not be dismissed on initial review.

**Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Quinn, Stabile, LaPonsie, Nichols, Fountain, Mahar, Hall, and Munro will be dismissed for failure to state a claim under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will also dismiss, for failure to state a claim, Plaintiff's claims that Defendants Golladay and Bender denied him immediate access to the restroom.

The following claims remain in this case: Plaintiff's First and Eighth Amendment claims against Defendants Golladay, Bender, Pancheri, Russo, Blemke, Stevenson, Koben, Portice, Portafield, Bosbous, Benoit, and Caldwell for denying Plaintiff approximately 17 meals on the following dates: November 22, 2018, December 1-4, 2018, and December 7-9, 2018, as well as Plaintiff's First Amendment retaliation claims against Defendants Bergeron, Pawley, Wilcox, Segmann, Schimmelpenny and Sprague.

An order consistent with this opinion will be entered.


Dated: July 8, 2019 /s/ Gordon J. Quist
GORDON J. QUIST
UNITED STATES DISTRICT JUDGE